# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 25-cr-250 (SLS)** |
| **DARIOUS PHILLIPS,** | |
| **Defendant.** | |

## MOTION FOR EMERGENCY REVIEW AND APPEAL OF RELEASE ORDER

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully appeals and seeks this Court's review of the proposed release order issued by the Honorable Magistrate Judge Zia Faruqui, dated September 17, 2025.[1]  The Government requests that the Court hear an appeal to review and overturn the denial of the Government's motion for pre-trial detention pursuant to 18 U.S.C §§ 3142(d)(1)(A)(iii) (on probation or parole) and (f)(1)(E) (felony involving the possession of a firearm or other dangerous weapon).  In short, Defendant Darious Phillips (hereinafter, "the defendant") is a serial gun offender who is currently on supervised release following his 2018 conviction for Aggravated Assault while Armed after shooting a man multiple times as the man was running away.  Despite facing the prospect of additional incarceration for violating the terms of his supervision, the defendant, within the last year, has managed to possess not one, but two loaded semi-automatic firearms, out in the community.

---

[1] A proposed release order has not yet been docketed.  Magistrate Judge Faruqui discussed conditions of release both on the record at the continued detention hearing held on September 17, 2025, and issued a minute order, dated September 18, 2025, reflecting the same.

As argued herein, the defendant should be detained pending trial as there are no conditions of release that can assure the safety of the community were the defendant to be released. As described below, all four statutory factors in § 3142(g) strongly favor pretrial detention. Moreover, the proposed third-party custodians are not suitable to supervise the defendant, if the defendant is released to home incarceration.

## I.     FACTUAL AND PROCEDURAL HISTORY

At approximately 8:30 PM on August 21, 2025, members of MPD's Robbery Suppression Unit and other law enforcement agencies were patrolling the 4000 block of South Capitol Street, SW, which is in Patrol Service Area 708, a PSA which has had 22 violent crimes reported over the last six months, including three homicides. Law enforcement agents were in marked and unmarked cars. The defendant was walking northbound on South Capitol Street with a woman when he appeared to notice the cars. He then pulled the woman he was with closer to his person, placed his right hand into his right jacket pocket, and made a downward pushing motion. Defendant Phillips then started walking away at a faster pace. When two law enforcement officers got out of their car, Phillips immediately started running northbound on South Capitol Street. As he was running, law enforcement agents in a vehicle driving parallel to the defendant saw him remove a black firearm with an extended magazine and hold it in his right hand while running in the middle of a public sidewalk with pedestrians nearby. He then made a tossing motion and continued to run.

Once he was apprehended – without any identification or a cell phone – law enforcement officers canvassed the flight path where he was observed making the tossing motion. Police

recovered the firearm in the Defendant's flight path approximately two minutes after the pursuit just feet away from where the Defendant had been running.





**Figures 1 and 2 – Snippets from Officer Body-Worn Camera**

More specifically, the firearm the Defendant possessed was a Masterpiece Arms model Mac9, semi-automatic pistol, which was chambered with one round of 9mm ammunition and 18 additional rounds in a high-capacity magazine, pictured below.



**Figures 3 – MA Mac9**

Agents later brought the defendant to the Seventh District stationhouse for potential questioning and read his *Miranda* rights to him.  Approximately thirty minutes into the interview, the Defendant told the agents he wished to speak with his mother multiple times, after which the agents provided him with a phone and allowed him to dial the number.  Once on the phone with his mother, the defendant said "Mom, they caught me with a gun, mom, they caught me with a gun.  I'm locked up."

United States Magistrate Judge G. Michael Harvey signed a criminal complaint on August 23, 2025, which charged the Defendant with one count of 18 U.S.C. 922(g).  Defendant had his Initial Appearance on August 25, 2025, where the government moved to detain him prior to trial

and the Court set the matter for a detention hearing on August 26, 2025.  The government filed a memorandum in support of pre-trial detention shortly thereafter.  On August 26, 2025, the Court held a detention hearing without the defendant present, where counsel made argument and the proposed third-party custodian, the defendant's mother, Ms. Voneshia Phillips, was subject to direct and cross-examination.  The matter was then continued multiple times on account of the defendant being hospitalized.[2]  On September 17, 2025, Magistrate Judge Faruqui presided over a continued detention hearing, with the defendant present, in which counsel once again made arguments and the Court ordered the defendant released to home incarceration with the defendant's mother and sister serving as third-party custodians.  The defendant's sister was never subject to examination during any detention hearing nor is it clear to undersigned counsel if the Pre-Trial Services Agency ever interviewed her.  During the hearing, His Honor described the case as a "close call" and told the defendant directly about the concerns the Court over the type of firearm he was carrying, for which the defendant apologized to the Court directly on the record.[3]

On September 18, 2025, the Court issued a minute order finding that conditions of release could be fashioned to reasonably assure the safety of the community and the defendant's appearance in court.  The Court also cited statistics in a law review article noting the increase in pre-trial detention and held that the Government had not presented an articulable danger and failed to meet its burden.  *See* Sept. 18, 2025 Minute Order.  ("Between 1983-the year before Congress enacted the Bail Reform Act-and 2019, federal pretrial incarceration rates skyrocketed from less than 24% to 75%. See Alison Siegler et al., Freedom Denied: How the Culture of Detention

---

[2] In the interim, a grand jury returned a true bill against the defendant charging him with one count of 18 U.S.C. § 922(g).

[3] Such statements are from undersigned counsel's recollection.  The government will order a transcript of the detention hearing and supplement the record accordingly.

Created a Federal Jailing Crisis, Univ. Chi. L. Sch. Fed. Crim. Just. Clinic 1, 2022 (Oct. 2022),

https://freedomdenied.law.uchicago.edu/report.")

The Court stayed its release order in light of how close its decision had been and the fact that the defendant has an outstanding warrant from the U.S. Parole Commission and permitted the government 48 hours within which to appeal the decision.   This appeal follows.

## II.    LEGAL STANDARD

Title 18, U.S.C. § 3145(a) states:

(a) **Review of a release order** - If a person is ordered released by a magistrate, . . .

>    (1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release . . .

The motion shall be determined promptly.

On the Government's motion to review a release order, this Court considers *de novo* the Magistrate Judge's denial of pretrial detention.  Although the D.C. Circuit "ha[s] not squarely decided the issue," *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021), every other circuit to have analyzed the issue has concluded the standard is *de novo.  See United States v. Blackson*, No. 23-cr-25 (BAH), 2023 U.S. Dist. LEXIS 18988, at *15 n.2 (D.D.C. Feb. 6, 2023) (collecting Court of Appeals cases from the First, Second, Third, Fourth, Fifth, Eighth, Ninth, and Tenth Circuits that support this proposition).

In its discretion, the Court may proceed to rehear the evidence by recalling the witnesses, reviewing transcripts, or by proceeding through proffer and argument.  It may take additional evidence from new witnesses or consider arguments not raised previously.  In short, the Court may proceed as best enables it to resolve the question posed: whether any condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any

other person and the community.

Under the relevant detention statutes, pretrial detention must be supported by clear and convincing evidence when the justification involves the safety of the community. *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). A defendant must be detained pending trial, if the Court determines that no condition or combination of conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). A finding of either risk of flight or danger is sufficient for detention. *See, e.g.*, *United States v. Ferranti*, 66 F.3d 540, 543-44 (2nd Cir. 1995).

## III.  ARGUMENT

The United States seeks detention of the defendant pursuant to 18 U.S.C. §§ 3142 (d)(1)(A)(iii) (on probation or parole) and (f)(1)(e) (firearm or dangerous weapon).

A review of the § 3142(g) factors make clear that no condition or combination of conditions will assure the safety of the community if the defendant were to be released. See 18 U.S.C. § 3142(e)(1). All four § 3142(g) factors favor detention pending trial, including: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. See 18 U.S.C. § 3142(g). Contrary to the Magistrate Judge's determination, there is a very articulable danger – the defendant's repeated possession of loaded, semi-automatic firearms while on supervised release for a grievous crime in which he repeatedly shot a man fleeing from him. The conditions fashioned by the Court to deal with this danger are premised on the Defendant's compliance with release – a premise which is without foundation.

A.    <u>**Nature and Circumstances of this Offense Merits Detention**</u>

The first factor to be considered, the nature and circumstances of the offense charged, weighs heavily in favor of detention.  At the time of his arrest, the defendant was walking around the District with a loaded firearm.  Although the offense charged is a possessory one, numerous District Judges in this District have warned against discounting the inherent danger associated with loaded firearms.  "Illegally possessing a fully loaded concealed firearm with easy, quick access in the front waistband of defendant's pants, while out in public, poses an inherent risk of danger to the community."  *United States v. Blackson*, 2023 WL 1778194, at *7.  This Court also has found that just one such gun poses a danger to the community, se*e United States v. Gassaway*, No. 21-cr-550 (RCL), 2021 WL 4206616, at *3 (D.D.C. Sept. 16, 2021) (collecting cases in this district holding that unlawful firearm possession is dangerous to the public), especially a firearm loaded with a round in the chamber, as was the case here.  *See United States v. Kent*, 496 F. Supp. 3d 500, 502 (D.D.C. 2020), aff'd (Nov. 5, 2020) (finding that a defendant should be detained pretrial in part because "the firearm recovered from the Defendant's person had a round already chambered, making the circumstances even more troubling.").  Furthermore, there are additional factors that make the defendant's conduct more egregious than many 922(g) cases that are routinely prosecuted in this District.  First, the firearm is somewhat unique and has distinguishing characteristics, including a large, detachable magazine (which in this case was loaded with 18 rounds of ammunition) as well as a threaded barrel.  Second, the way in which the defendant handled the firearm – removing it from his person in a densely populated urban area and running with it on the 4000 block of South Capitol St. SW for several seconds – enhanced the danger to all involved, including to the defendant himself and the nearby pedestrians.  Third, the defendant has previously

demonstrated a willingness to actually use a firearm to hurt someone as evidenced by his 2018 Aggravated Assault while Armed conviction detailed below.

     B.      <u>**The Weight of the Evidence Against the Defendant is Formidable**</u>.

The second factor to be considered, the weight of the evidence, also weighs in favor of detention.[4] The Government's case against the defendant is strong. Phillips ran from police when it was clear that officers were trying to contact him. As he was running from officers who were pursuing him on foot, two different officers who were driving parallel to Phillips saw him remove what they recognized to be a black firearm with an extended magazine and hold it in his right hand as he was running. He was observed making a tossing motion, after which the firearm was no longer visible. After Phillips kept running, he was ultimately apprehended and officers located the black semi-automatic pistol with the extended magazine in a grassy area where Phillips had been running within two minutes. Furthermore, during a recorded interview with law enforcement, the defendant made voluntary, unprompted statements on a phone call to his mother that he had been "caught with a gun." Finally, at his continued detention hearing on September 17, 2025, as the Court warned the Defendant regarding the dangers posed by firearms, to which the defendant apologized.

---

[4] This factor should be equally weighed. In *United States v. Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." 2023 WL 1778194 at *8. Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* at *10. In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). The Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). This Court should follow *Blackson* and *Zhang;* this factor should be given no less weight than any other factor.

C.    **The Defendant's History and Characteristics Merit Detention.**

The third factor, the defendant's history and characteristics, likewise favors detention.  The defendant's predicate felony is a particularly violent one.  Defendant Phillips shot a man after they were engaged in a verbal altercation at a gas station while congregating around a gas pump with the defendant's friends.  See Exhibit 1 (Signed Proffer of Facts).  He then committed the instant offense while on supervision for that shooting.  His willingness to walk around the District of Columbia with a dangerous loaded firearm while on supervision for his Aggravated Assault while Armed conviction shows that he is a danger to the community and that he is unlikely to abide by pretrial release conditions in this case.

And as stated above, this is the Defendant's second instance in which he possessed a loaded firearm in the District of Columbia while on supervision.  The Defendant was indicted in July 2025 in D.C. Superior Court for possessing a firearm in October 2024.  In that instance, On October 9, 2024 around 9:30 pm, Sergeants Davies and Decker with MPD responded to a ShotSpotter detection in the area of 504 Lebaum Street SE Washington DC.  Upon arriving at the location, unidentified witnesses told the officers about a man and woman walking with a baby stroller nearby.  Sgt. Davies then turned onto MLK Jr. Ave and near the intersection of MLK Jr. Ave and Mellon Street saw a man (Darious Phillips) and a woman (Danielle Snowden) pushing a baby stroller.

As the sergeants approached, Phillips separated from Snowden and the baby stroller and walked at a hurried pace in the opposite direction.  The Sergeants exited their cruiser and followed Phillips to initiate contact.  Phillips consented to a pat down, and the officers did not locate anything.  Phillips did not provide his name to the police and subsequently left.



Figure 4 – Snippet from Officer Body-Worn Camera

The sergeants then caught up to Snowden who was still pushing the stroller.  When Sgt. Davies approached, he asked Snowden if the man she was just with had given her a gun.  Snowden stated that he did not.  While speaking with Snowden, Sgt. Davies observed the grip of a pistol in Snowden's unzipped front left jacket pocket.



**Figures 5 – Photograph of Defendant Snowden**

Officers placed Snowden into handcuffs and recovered the pistol from her jacket pocket. Snowden proceeded to tell officers that her baby's father, Darious Phillips, put the gun in her jacket pocket and that she does not carry guns. She further stated she did not know the object he gave her was a gun because things were happening too fast. The recovered firearm was a Polymer 80 ghost gun loaded with 7 rounds in a 12 rounds magazine and 1 round in the chamber.



**Figures 6 – Photograph of Firearm from October 2024 Offense**

An MPD surveillance camera from the intersection of MLK Jr. Ave and Mellon St. recorded a portion of these events.  See Ex. 2.  The footage shows a man and a woman walking together with a stroller.  They appear to be Snowden and Phillips based on their clothing, hair, and builds. In that video, Phillips appears to give a dark colored object to Snowden just prior to walking away from her and then, interestingly, immediately afterward, begins taking off the red sweatshirt he had been wearing and which officers later observed him carrying in his hand.  This occurs at 9:42 in the surveillance footage.  At 9:44, the officers can be seen traveling down Mellon Street to catch up to Snowden.

While Snowden was arrested on scene, Phillips remained at large and could not be apprehended that evening.  He was eventually identified based on investigators' review of the footage from that evening as well as body-worn camera footage from a separate incident in March 2025.   Phillips was indicted by a Superior Court grand jury in July 2025 for Unlawful Possession

of a Firearm (Prior Conviction); Carrying a Pistol Without a License (Outside Home or Place of Business); Possession of a Prohibited Weapon; Possession Of Unregistered Firearm; and Unlawful Possession Of Ammunition).

The Defendant has proven that he cannot and will not abide by the terms of supervision. There is no greater evidence of this fact than his continued willingness to possess loaded, semi-automatic firearms out in the District even knowing that he was a felon and should he be apprehended, he would face revocation at the hands of the U.S. Parole Commission and be re-sentence to up to 60 months of "back-up" time. *See* D.C. Code § 24-403.01(b)(7)(A).

### D.    <u>The Defendant Presents a Danger to Our Community.</u>

The fourth and final factor, danger to any person or the community posed by the defendant's release, similarly weighs in favor of detention. As noted above, even though he knows firsthand the danger of carrying a loaded firearm in the District and had every incentive to comply with the law given that he was on supervised release for a violent felony, Phillips chose to double down on walking around the District with a loaded firearm. This was, of course, Phillips's second time walking around the District of Columbia with a loaded firearm while apparently undeterred by being on supervised release. In the first instance, he also possessed a loaded, semi-automatic pistol while walking around the District, in circumstances that are deeply concerning, with officers responding to sounds of shots fired, witnesses saying a man and woman with a stroller were involved, and then Phillips handing a loaded firearm to the woman with the stroller, while attempting to change out his clothing. Defendant's past conduct demonstrates that not even court-ordered supervision is sufficient to prevent him from carrying around loaded firearms in the community.

### E.    <u>Third-Party Custodians Cannot Ensure the Safety of the Community.</u>

Against the overwhelming weight of the evidence in favor of the defendant's continued pre-trial detention, which Magistrate Judge Faruqui acknowledged repeatedly, the Defendant was ordered to home incarceration with his mother and sister as third-party custodians, because, in the Court's view, this would keep him away from firearms.

Such conditions do little to mitigate the danger posed for several reasons. Foremost among these is that at the time of possessing both the instant loaded semi-automatic firearm, and the additional firearm in October 2024, he was already under supervision and chose to flout the terms of that supervision by illegally possessing firearms in the community. There is no basis to think that even though the defendant repeatedly brushed aside the terms of his prior supervision, he will suddenly begin comply with more stringent conditions.

While the Court and the defendant's counsel emphasized that the defendant would now be monitored by a third-party custodian, this arrangement is inherently problematic for several reasons. The Defendant has been supervised by an established and professional organization which trains its officers and provides them resources to ensure supervisee compliance since his release in March 2023. Since then, he has repeatedly possessed firearms. Where that supervision failed, the Magistrate Judge's release order envisions that the supervision offered by his mother and sister will somehow succeed. There is no factual basis for such a belief. First, at the time of walking around the District with a loaded semi-automatic Masterpiece Mac 9 with 19 rounds of ammunition, the defendant *was already living with his mother*, yet despite being under her roof, and despite being under supervision, he still possessed a firearm. Furthermore, the October 2024 possession charge in Superior Court occurred not far from where the Defendant's mother lived. Finally, there is little basis in this record to believe that the defendant – who is not an

impressionable, young adult, but a 34-year-old man – will now submit to the authority of his mother, and when his mother is absent, his sister. *See United States v. Long*, 2020 WL 2434588, at *2 (W.D. Pa. June 15, 2021) ("An authority figure who enters the picture and takes charge of a young and unsophisticated offender provides greater protection to the community than does a third-party custodian who is essentially a peer of the defendant, especially one who was already socially affiliated with the defendant during the time the defendant is alleged to have committed the very offenses charged.").

Second, the Court's order in essence proposes that the Defendant's family members act as his purported jailers, maintaining a 24-hour watch on the Defendant Phillips from the start. This is problematic for several reasons. Not only are these individuals his own family members, who presumably would not want to see him preventatively detained and thus have an incentive to not report violations, but in addition, as was elicited at the hearings, the defendant's mother is employed full-time and his sister was never actually examined by either the Court or counsel. Nevertheless, the Court's order would effectively force them to become full-time corrections officers. Courts in this District have repeatedly found that such arrangements are insufficient to mitigate dangers posed to the community by defendants. *See* Order (ECF No. 14), *United States v. Joyner*, 22-CR-252 (TNM) (D.D.C. Aug. 3, 2022) (reversing the magistrate court's order releasing the defendant to a third-party custodian); Order (ECF No. 55), *United States v. Handy*, 22-CR-164 (RBW), *aff'd*, Case No. 22-3045, (D.C. Cir. 2022) (same); Order, (ECF No. 54), *United States v. Charles Cunningham*, 23-CR-7 (JMC) (D.D.C. Mar. 13, 2023) ("third-party custodian, no matter how competent or dedicated, cannot stand in the shoes of the defendant. Nor should a third-party custodian be cast in the role of jailer…. Mr. Cunningham's custodians cannot supervise his behavior on a 24/7 basis."); Order, (ECF No. 18), *United States v. Trevor Wright*, 22-

CR-410 (CRC) (D.D.C. Dec. 23, 2022) ("family members are not correctional officers. Nor should they be expected to play that role"); Order, (ECF No. 10), *United States v. Steffon Frazier*, 23-CR-255 (ABJ) (D.D.C. Sept. 18, 2023) (reversing magistrate judge's decision appointing a mother as a third-party custodian in a gun possession case).  While the Court's minute order speaks of "around-the-clock" monitoring of the defendant, the greater weight of authority in this District recognizes that such monitoring is not a realistic possibility.  If round-the-clock monitoring is what is required in the Court's view to assure the safety of the community because of the dangers the defendant poses, the institution best situated to perform that duty in our society is a correctional facility.

## IV.    CONCLUSION

WHEREFORE, the government respectfully requests that the Court order the defendant detained without bond.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By:

Will Hart
D.C. Bar No. 1029325
Assistant United States Attorney
United States Attorney's Office
for the District of Columbia
601 D Street NW
Washington, D.C. 20530